**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 06-526-03** |
| | : | |
| **DANIEL CHARLES** | : | |

**MEMORANDUM**

**STENGEL, J.** **November 28, 2007**

Daniel Charles and his two co-defendants were indicted by a federal grand jury with various firearms and robbery charges stemming from an incident on January 25, 2006. Charles filed a motion to suppress evidence and a motion to dismiss the indictment. For the following reasons, I will deny both motions in their entirety.

## I. BACKGROUND

Detective Brian Boos of the Philadelphia Police Department testified at a hearing on the motions that three men wearing ski masks and dark clothing entered the Rite Aid store at 600 North Broad Street in Philadelphia just before closing. Surveillance tapes showed the men proceeding toward the back of the store. The cashier hurried to the office to alert assistant manager Ernesto Elefante. Elefante left the office to investigate, and encountered one of the men who forced Elefante at gunpoint back into the office. Elefante said the handgun was gray in color. The gunman directed Elefante to open the store's safe. The man took $2,000 cash, $500 of which was in quarters, from the safe and demanded that Elefante and the cashier remain in the office. The tape also shows Ivan

Dublin, a third employee of the store, running outside onto Broad Street waving his arms to a passing patrol car. Two of the three masked men followed closely behind Dublin. The officers in the patrol car noticed the two men and ordered them to stop. St. Jean cooperated and stopped on command. Carolina attempted to flee but was quickly apprehended. St. Jean was carrying a black unloaded Ruger semiautomatic pistol in his waistband while officers recovered a Raven Arms .25 caliber semiautomatic from a sewer grate near where co-defendant Carolina was arrested. See Government Exhibits #2 and 4. It is alleged that Carolina threw the gun while fleeing the scene. See Government Exhibit #4. The third man, presumably the gunman, went unnoticed and escaped the scene. Elefante identified one of the two men as Aaron St. Jean, a former employee of the store. Another store manager, Michael Anderson, was called to the scene and identified the second suspect as Walter Carolina, Jr., another former Rite Aid employee. When the police told Anderson that there were three gunmen involved, he suggested that the third man could have been Daniel Charles, another former employee. In Anderson's statement to the police, he explained that "[w]hen Dan worked here they all was hanging together . . . . [t]hat's how I came up with the other guy." See Government Exhibit #5. In a statement to police, Elefante identified St. Jean as the gunman, described him as "the offender," and said that he was tall.[1] Elefante also mentioned that he recognized St. Jean and Charles as former Rite Aid employees, and that he had spoken with them in the Rite

1 St. Jean's height is alleged to be 5'11" while the height of both his co-defendants is alleged to be 5'8" or shorter.

Aid store "about an hour before the robbery." Id.

## II. PRETRIAL MOTIONS

### A. Motion to Suppress Evidence Seized by Search Warrant

Charles requested a hearing pursuant to the Franks doctrine to determine the validity of the search warrant authorizing the search of the home of his parents, where he resided. The Franks doctrine allows for a hearing to be held at the defendant's request when: (1) the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant's affidavit; and (2) if the allegedly false statement is necessary to the finding of probable cause. Franks v. Delaware, 438 U.S. 154, 171-72 (1978); see also Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (the defendant must prove by a preponderance of the evidence that (1) the affiant knowingly and deliberately or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant; and (2) such statements or omissions were material, or necessary, to the probable cause determination). If, after the hearing, it is determined that the affidavit had insufficient content for a finding of probable cause, the search warrant must be voided and the fruits of the search excluded. Franks v. Delaware, 438 U.S. at 172; see also Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000) (search warrant deemed invalid where issued as a result of a material omission that misled the judicial officer).

Here, Charles challenges the application for the search of his residence, and insists that Detective Boos intentionally omitted from the affidavit the fact that Elefante had identified the "tall" St. Jean as the gunman who forced him back into the office. As a result, Charles contends, the only fact in the affidavit that ties him to the crime is that the gunman wore "dark clothing" and that Charles was seen in dark clothing an hour earlier inside the store. Charles argues that these intentional omissions and misleading statements deceived the Bail Commissioner into issuing a search warrant based upon "false impressions." Sherwood v. Mulvihill, 113 F.3d at 399.

In an abundance of caution, I conducted a Franks hearing at which Detective Boos testified. I found him to be very credible as he related how he and other law enforcement officers investigated the robbery of the Rite Aid Store. Before applying for the search warrant on the day following the incident, Detective Boos reviewed the statements of the Rite Aid employees, and watched a surveillance videotape of the incident. It was clear from this review that two males in dark clothing left the store closely behind Dublin, and the third male in dark clothing, believed to be the gunman, left several minutes later and successfully fled the scene. The first two males were identified by Rite Aid employees as Aaron St. Jean and Walter Carolina. Detective Boos testified that the Rite Aid managers also provided the addresses of the three suspects to the police. Charles' address was a few blocks from the Rite Aid. See Government Exhibit #5. Police were dispatched to that address and witnessed Charles exiting the house wearing dark clothing. A member

of his family told police that Charles had just run into the house a few minutes before.

After receiving the necessary approvals from his superiors, Detective Boos presented the application for the search of Charles' address to a Bail Commissioner who determined that probable cause existed for the search. Specifically, the warrant sought the search and seizure of the proceeds of the robbery, the handgun, and a black ski mask. During the search, police recovered from Charles' bedroom a gray Ruger 9 mm handgun loaded with two live rounds, as well as two additional gun magazines. See Government Exhibit #7. Also recovered was $210 in cash, a box full of rolled quarters in the amount of $500, a black ski mask, Daniel Charles' driver's license, and two letters addressed to Daniel Charles. Id. The manager of the Rite-Aid had reported to the police that about $2,000 had been taken from the safe, $500 of which was in rolled quarters. See Government Exhibit #7.

In the affidavit, Detective Boos did not explicitly name Charles as the gunman. Indeed, it was not necessary for a finding of probable cause to indicate which one of the three suspects was the actual robber. All three men were involved in the crime. As the detective testified, however, the circumstances of the arrests demonstrate that St. Jean was more than likely not the gunman who forced Elefante back into the office, despite Elefante's statement to police. St. Jean and Carolina were the two men who fled the store after Dublin ran outside. An unknown and armed third man remained in the office with Elefante, cleaning out the safe. Under these circumstances, it was reasonable for

experienced law enforcement officials to have believed that the third man was Charles.

After careful consideration of Detective Boos' testimony and a careful review of the application for a search warrant, I am convinced that the affidavit contained no false or misleading information, and that Detective Boos did not knowingly or intentionally or with reckless disregard for the truth include any false statements or omit any necessary or material information in the application for the search warrant. Franks v. Delaware, 438 U.S. at 171-72. Thus, I will deny the motion to suppress.

**C. Defendant's Motion to Dismiss Indictment**

Charles also moves to dismiss the indictment against him under the Sixth Amendment's guarantee of his right to a "speedy and public trial." Both the defendant and the public have an interest in the Speedy Trial guarantee: the defendant has an interest in being tried promptly, and the public has an interest in seeing suspects swiftly and efficiently tried or acquitted. Barker v. Wingo, 407 U.S. 514, 519 (1972).

In order to conduct an inquiry into whether the delay is offensive to a defendant's Sixth Amendment rights, there must be a showing that the delay between the indictment and trial was "presumptively prejudicial" to the defendant. Barker v. Wingo, 505 U.S. at 530. If the delay is determined to be "presumptively prejudicial," the court's inquiry is controlled by the four Barker factors: (1) length of the delay between the charge and the trial; (2) the reason for the delay; (3) whether the defendant has asserted his right to a speedy trial; and (4) the prejudice to the defendant in the form of oppressive pretrial

incarceration, anxiety and concern, or the impairment of his defense. Barker v. Wingo, 407 U.S. 514, 530. No one factor is dispositive, but rather each is weighed against the other. The Speedy Trial right in any case is "slippery," "amorphous," and "impossible to state with precision." Id. at 522-23. The analysis must be geared towards the particular, fact-bound context of each case. Id. at 522.

Charles contends that a delay of twenty-two months from his initial arrest by state authorities meets the Barker standard of presumptive prejudice because twenty-two months of incarceration is an unnecessarily lengthy delay for the "ordinary street crime" that he is accused of committing. However, it is important to note that an arrest on state charges does not trigger speedy trial protection for a subsequent federal charge, especially when the defendant was arrested on state charges. United States v. Marler, 756 F.2d 206, 211 (1d Cir. 1985); United States v. Mejias, 552 F.2d 435, 441-43 (2d Cir. 1977); United States v. Wallace, 326 F.3d 881, 885 (7th Cir. 2003); United States v. Garner, 32 F.3d 1305, 1309 (8th Cir. 1994); United States v. Romero, 585 F.2d 391, 398 (9th Cir. 1978); United States v. Gomez, 67 F.3d 1515, 1521 (10th Cir. 1995). So, the applicable delay here is not twenty-two months of incarceration, but twelve months of incarceration.

The Supreme Court has recognized that a delay of one year has been accepted by lower courts as a bench mark sufficient to trigger a Barker inquiry. Doggett v. United States, 505 U.S. 647, 652, n. 1 (1992). Charles has been incarcerated on federal charges for approximately twelve months. Therefore, in an abundance of caution, I find it

appropriate to continue weighing the other Barker factors.

The length of the delay functions both as a threshold and as a separate factor in the balancing test. Hakeem v. Beyer, 990 F.2d 750, 759-60 (3d Cir. 1993). Once the "presumptively prejudicial" threshold is met as here, the length enters into the balance as one of the four factors to be weighed, and its weight increases with its length. Id. (citing Doggett, 505 U.S. at 651-52. The government does not concede that a period of incarceration of twelve months between the indictment and the trial is presumptively prejudicial. Nevertheless, I find that, though significant, a twelve month delay is not oppressive pretrial incarceration considering the totality of the circumstances of this case as explained below. Thus, the length of the delay does not weigh in Charles' favor.

Next, the reason for the delay must be carefully analyzed to see who created the delay and whether the delay was an unacceptable manipulation or an acceptable incident of the criminal process. Trial delays can be caused by the machinations of either defendant or prosecution, and they can operate either in the defendant's or the prosecution's favor. See Barker, 407 U.S. at 527-28.

Here, there was no manipulation of the criminal process. In fact, several acceptable factors combined to cause the delay. The superceding indictment returned against Charles was filed on November 28, 2006. An initial appearance and arraignment were scheduled for December 14, 2006. On December 20, 2006, Charles filed a motion to continue the arraignment and pretrial detention. The following day, co-defendant

Carolina filed a motion for continuance of the January 22, 2007 trial date which I granted on January 9, 2007. Charles was ordered detained pending trial after a hearing on December 27, 2006. On February 9, 2007, Charles filed a motion to suppress to which the government responded. Co-defendant Carolina was scheduled to plead guilty on April 25, 2007. I granted two subsequent motions for a continuance of that hearing, and Carolina finally pled guilty on July 12, 2007. On June 28, 2007, Charles filed a motion to dismiss the indictment to which the government responded.

The length of the delay can also be attributed to the fact that the case involved two separate conspiracies, one for a robbery and another for the straw purchase of a gun. There are three co-defendants that do not share a common defense. Furthermore, Charles' motion to suppress is in itself a legitimate reason for the delay. See 18 U.S.C. § 3161(h)(1)(F) (under the Speedy Trial Act, certain periods of delay are excluded including any period of delay resulting from other proceedings concerning the defendant, including but not limited to delay resulting from any pretrial motion, from the filing of the motion to the conclusion of the hearing on, or other prompt disposition of, such motion).

Contrary to Charles' contention, the record reflects no dilatory tactics on the part of the government. He insists that the crime for which he was originally arrested remained the same after the federal indictment, and characterizes it as an ordinary street crime, a "garden-variety drug-store holdup, prosecuted in the county courts every day." Initially, Charles was arrested by local authorities, charged by a local district attorney, and

placed at PICC, a local correctional institution. However, federal authorities became involved when the investigation unfolded straw purchases of firearms, two separate conspiracies, and Charles' previous criminal record which included at least one felony in the state of New Jersey. Thus, this second Barker factor also does not weigh in favor of Charles' claim of a Speedy Trial violation.

Next, a defendant's assertion of his Speedy Trial rights weighs in his favor, although failure to assert the right does not waive it. Barker, 407 U.S. at 528. There is no requirement that a *pro se* defendant make a formally perfect Speedy Trial demand. However, where a defendant is represented by counsel as he is here, there should be a formal motion or notice to the prosecution in order for this factor to weigh "heavily" in favor of the defendant. Hakeem, 990 F.2d at 765.

Here, Charles argues that he did not waive his right to a speedy trial simply because he waited until June 2007 to file a motion to dismiss. I note, however, that Charles neither objected when his co-defendants requested and were granted continuances in this matter, nor did he request that his case be severed from his co-defendants to hasten his trial date, nor did he make any other efforts to expedite his trial date prior to filing this motion. Because Charles asserted his right to a speedy trial seven months after the filing of the superceding indictment, the moderate weight given to this factor is in Charles' favor.

Finally, the fourth factor to be considered is the prejudice to Charles in the form of

oppressive pretrial incarceration, anxiety and concern, or the impairment of his defense. Charles argues only that prejudice is presumed in his case due to "the evil of extensive pretrial incarceration." All pretrial detention can inflict a potentially serious mental burden, even where one is already incarcerated on another charge, because the specter of the unresolved charges creates anxiety independent of the incarceration itself. Smith v. Hooey, 393 U.S. 374, 379 (1969). As the Supreme Court found:

> Inordinate delay "wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' United States v. Marion, 404 U.S. 307, 320 (1971). These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty."

Moore v. Arizona, 414 U.S. 25, 26-27 (1973) (per curiam) (quoting Barker, 407 U.S. at 537). A defendant cannot prevail, however, merely by claiming that many months of anxiety over the outcome of the trial has prejudiced him to the extent necessary to prevail on a Sixth Amendment claim. Hakeem, 990 F.2d at 762. Vague allegations of anxiety are insufficient to state a cognizable claim; a defendant must show that his anxiety extended beyond that which "is inevitable in a criminal case." Id. (citing United States v. Dreyer, 533 F.2d 112, 116 (3d Cir. 1976)). In order to reach that level, the defendant must produce evidence of psychic injury. Id. Charles has not produced such evidence.

Further, there has been no evidence presented to show that Charles' defense has been hindered by his incarceration. For example, there is no claim that evidence has become stale, that memories of potential witnesses have grown foggy, that potential witnesses have died, or other physical evidence has decayed. Charles is understandably concerned, as any detained criminal defendant would be, that continual delays in pretrial proceedings will delay his release even further during a period of time in which Charles has not yet been convicted, but is presumed innocent.

Weighing all of these factors and circumstances, I find that the delay of approximately twelve months is not sufficient to establish a violation of Charles' Sixth Amendment right to a speedy trial. I will deny Charles' motion to dismiss the indictment.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 06-526-03** |
| | : | |
| **DANIEL CHARLES** | : | |

**O R D E R**

**STENGEL, J.**

**AND NOW**, this 28th day of November, 2007, upon consideration of the defendant's motion to suppress (Document #46), the government's response thereto (Document #47), the defendant's motion to dismiss the indictment (Document #56), the government's response thereto (Document #60), and after a hearing on the motions, it is hereby ORDERED that the motions are DENIED.

BY THE COURT:

/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.